| | | |
|---|---|---|
| John W. von Holdt, Jr., | ) | |
| Janice Anderson, and Plas-Tool Co., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 04 C 04123 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| A-1 Tool Corporation, Triangle Tool | ) | |
| Corporation, Alfonso Arciniegas, | ) | |
| Geoffrey Luther, and Leroy Luther, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

John W. von Holdt, Jr., Janice Anderson, and Plas-Tool Company (collectively, "Plaintiffs") filed a complaint against A-1 Tool Corporation, Triangle Tool Corporation, Alfonso Arciniegas, Geoffrey Luther, and LeRoy Luther (collectively, "Defendants"), alleging patent infringement (Count 1), a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (Count 2), and various state-law claims including violations of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (Count 3), breach of fiduciary duty (Count 4), inducement to breach fiduciary duty (Count 7), tortious interference with business expectancies (Count 8), and conspiracy to tortiously interfere with business expectancies (Count 9).[1] R. 232 (Fourth Am. Compl.).

Defendants moved for summary judgment on all claims. R. 524. In support, Defendants filed two briefs: one seeking judgment as to the patent infringement claim,

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367. The complaint does not contain claims labeled as Count 5 and 6.

R. 525, and the other as to the remaining claims, R. 526. The district judge previously assigned to this case granted summary judgment to Defendants on the federal claims (Counts 1 and 2), and then relinquished supplemental jurisdiction over the remaining state-law claims. *See* R. 858. Plaintiffs moved to reconsider the decision to relinquish jurisdiction over the state-law claims. R. 885. The previously-assigned judge granted the motion, and the case was re-opened for the purpose of litigating the state-law claims. R. 886. The case was reassigned to this Court. R. 892. For reasons explained more fully below, the Court grants Defendants' motion for summary judgment as to Counts 7, 8, and 9; the motion is denied as to Counts 3 and 4 (the Trade Secrets Act and fiduciary-duty claims).

## I. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## II. Factual Background

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to Plaintiffs. Plas-Tool was a small, family-owned company in the business of making molds that produce plastic buckets and lids.[2] R. 528, Defs.' Stmt. of Facts (DSOF) ¶ 1; R. 543, Pls.' Stmt. of Facts (PSOF) ¶ 1. Defendant Alfonso Arciniegas began working at Plas-Tool as a mold design engineer in 1978. PSOF ¶ 14. Arciniegas ultimately became Plas-Tool's principal salesperson in Latin America and vice president of the company. PSOF ¶ 15. Arciniegas was also the brother-in-law of Plaintiff John von Holdt, Jr., who is Plas-Tool's President, Chairman, and principal shareholder. PSOF ¶¶ 3-4, 16. In 1997, Arciniegas resigned from his position at Plas-Tool, and began working for Defendant A-1 Tool Corporation. PSOF ¶ 18.

Plaintiffs allege that Arciniegas took a lengthy list of Plas-Tool's customers with him when he left Plas-Tool, and used the list to contact Plas-Tool's customers and sell molds manufactured by Arciniegas's new employer, A-1. PSOF ¶¶ 21, 25-27. Plaintiffs also claim that within months of Arciniegas joining A-1, A-1 began manufacturing molds that incorporated Plas-Tool's trade secrets. PSOF ¶¶ 25, 88. Defendants dispute all of these allegations.

## III. Illinois Trade Secrets Act (Count 3)

In Count 3, Plaintiffs allege that Defendants violated the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*. To establish liability under the Act, a plaintiff must prove

---

[2]Plas-Tool closed its operations in July 2008. R. 543, Pls.' Stmt. of Facts (PSOF) ¶ 5.

that information is: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *Delta Med. Sys. v. Mid-Am. Med. Sys.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002). Here, Plaintiffs claim trade-secret protection for both technical and non-technical information. Plaintiffs' technical information consists of (a) six pieces of information relating to pail molds; (b) seven pieces of information relating to pail lid molds; and (c) one piece of information relating to the design of pails. R. 541 (Pls.' Br..) at 5; PSOF ¶ 86. Plaintiffs' non-technical information includes customer information, customer contact information, customer order history, and pricing and credit history. Pls.' Br. at 5; PSOF ¶ 11.

## A. Technical information

Defendants argue that Plaintiffs have not provided evidence sufficient for a jury to conclude that they have satisfied each element of the Trade Secrets Act.

"Trade secret" is defined by the Act as:

information, including but not limited to, technical or non-technical data, a . . . compilation, . . . financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). Thus, in order for information to qualify as a trade secret under the Act, the information must meet two requirements: (1) the information must be sufficiently secret to give the plaintiff a competitive advantage, and (2) the information

must be subjected to affirmative measures to prevent others from acquiring or using it. *Sys. Dev. Servs. Inc., v. Haarmann*, 907 N.E.2d 63, 73 (Ill. App. Ct. 2009). The Court will address the second element first.

### 1. Reasonable measures to keep information confidential

The determination of "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) (noting that "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment"). That said, summary judgment *is* proper in cases where it is "readily apparent that reasonable measures [to maintain confidentiality] simply were not taken." *Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) (plaintiff's widespread nonconfidential disclosure of memo required summary judgment to be granted; no reasonable jury could find that plaintiff took reasonable efforts to keep the memo confidential).

Plaintiffs contend that they took reasonable measures to protect Plas-Tool's secret information because they limited the information provided to customers and maintained confidentiality agreements. Defendants assert, however, that Plaintiffs failed to protect Plas-Tool's purported trade secrets because they disclosed the information to customers, potential customers, vendors, employees, and others without entering into confidentiality or non-disclosure agreements. DSOF ¶¶ 31-32. For instance, it is undisputed that Plas-Tool's written confidentiality agreements with

Owens Corning and Rubbermaid (both Plas-Tool customers) are limited to protecting only the confidential information of the *customer*, not that of Plas-Tool. R. 736, Pls.' Resp. DSOF ¶ 14. And Plas-Tool was unable to locate written confidentiality agreements for all of its customers. *Id.* ¶ 11.

Plaintiffs argue that written confidentiality agreements are not strictly necessary in the mold-making industry because there is an understanding, or custom, within the industry that a manufacturer's proprietary information is confidential. Pls.' Br. at 9-11. So the key issue is whether it was "reasonable," under the Illinois Trade Secrets Act, for Plas-Tool to rely on this alleged industry custom as a means to protect its confidential information (or, more precisely, whether a reasonable jury could so conclude).

Unable to point to any controlling law on this issue, Plaintiffs principally rely on von Holdt's affidavit, in which he states that "[t]he custom in the Industry is that there is an understanding that proprietary pail and lid mold information disclosed to and received from a pail and lid mold manufacturer is to be treated as confidential and not disclosed to any third party until and unless such information becomes publicly available." R. 677, Pls.' Exh. 11 (von Holdt Decl.) ¶ 11.[3] Plaintiffs also refer to the affidavits of three individuals who claim to have worked in the pail and lid

_____

[3]Plaintiffs also point to Glenn Beall's affidavit stating that it is industry custom to keep information secret, even in the absence of a written agreement. *See* Pls.' Br. at 10. But as already discussed in the Court's previous order granting Defendants' motion to strike Beall's declaration in part and denying the motion in part, this portion of Beall's declaration is stricken because it contradicts his earlier deposition testimony without a valid explanation for the contradiction. R. 919 at 2-3.

manufacturing industry and who attest that, in the industry, "there is an understanding that pail and lid mold information disclosed to and received from a pail and lid mold manufacturer is to be treated as confidential and not disclosed to any third-party until and unless such information becomes publicly available." R. 681, Pls.' Exh. 15 (J. Viesca Decl.) ¶ 12; R. 682, Pls.' Exh. 16 (A. Viesca Decl.) ¶ 11; R. 683, Pls.' Exh. 17 (Jones Decl.) ¶ 22.

Defendants respond that industry custom is not a proper basis on which to rely to show reasonable efforts to protect secrecy under the Trade Secrets Act. R. 526, Defs.' Br. at 11-12 (citing *Web Commc'ns Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 320 (N.D. Ill. 1995) and *Nat'l Presto Indus. v. Hamilton Beach, Inc.,* 1990 WL 208594 (N.D. Ill. Dec. 12, 1990)). But, like Plaintiffs, Defendants are unable to point to any controlling legal authority holding that, as a matter of law, industry custom cannot be the basis of "reasonable" efforts under the Act. The district court decisions cited by Defendants are not binding here, nor are they directly on point. The plaintiff in *Web Communications*, for instance, was a print production company that claimed to have developed a concept for use in the defendant's printed advertisement. 889 F. Supp. at 318. After the defendant retained a different company to print the ad, the plaintiff sued the defendant under the Illinois Trade Secrets Act. *Id.* at 318-19. Although the plaintiff did not have a confidentiality agreement with the defendant, the plaintiff argued that "industry custom and implicit confidentiality were sufficient to protect the secrecy of the [concept]." *Id.* at 320. The district court disagreed, in part because the printing trade customs cited by the plaintiff focused primarily on the *ownership* of items

7

developed and produced in the printing industry, as opposed to the *confidentiality* of those items. *Id.* The court also noted that the plaintiff disclosed the alleged trade secret to one of its competitors, and the president of the plaintiff-company acknowledged that it was possible that the competitor would then take the plaintiff's concept and use it for its own benefit. *Web Commc'ns.,* 889 F. Supp. at 320.

Similarly, *National Presto Industries v. Hamilton Beach, Inc.,* the other case cited by Defendants, is also distinguishable. 1990 WL 208594, at *9. In that case, the plaintiff showed its new product to hundreds of customers before formally introducing the product to the market. *Id.* at *1. The plaintiff did not require customers to sign confidentiality forms and even began selling the product from its factory outlet store before its official release. *Id.* at *9. In light of these facts, the district court concluded that the plaintiff's reliance on "implicit confidentiality" was not enough to reasonably protect its alleged trade secret. *Id. National Presto* does not address whether there was an industry custom to keep information regarding new products as confidential in the plaintiff's industry, and it does not appear that the plaintiff made that argument.

In contrast, here, Plaintiffs submit admissible evidence that it is understood by manufacturers and customers in the mold-making industry that proprietary information is not to be disclosed to third-parties. PSOF ¶ 32. Plaintiffs assert that adhering to this industry custom is "crucial" because just as Plas-Tool does not want the features of its pail and lid molds disclosed to its competitors, Plas-Tool's customers do not want *their* competitors to know what pails the customers are planning to make. PSOF ¶ 34. As discussed above, the record contains affidavits from pail and lid

manufacturers, including von Holdt, who have decades of experience in the industry. PSOF ¶ 32; *see* J. Viesca Decl. ¶ 2 (over 20 years' experience in the pail and lid business); A. Viesca Decl. ¶ 2 (over 24 years' experience); Jones Decl. ¶ 2 (over 30 years' experience). The Court concludes that these affidavits are sufficient to create a genuine issue of material fact with respect to whether Plaintiffs took reasonable steps to protect the confidentiality of their technical information. Of course, proving this element to a jury is a different matter than raising a genuine issue when evidence is viewed in Plaintiffs' favor, but it is for a jury to decide.

Moreover, Illinois decisions interpreting the Trade Secrets Act suggest (although admittedly they do not outright hold) that a plaintiff's ability to show that an *understanding* regarding confidentiality may constitute reasonable security measures under the Act. *See, e.g., Gillis Associated Indus. v. Cari-All, Inc.,* 564 N.E.2d 881, 885-86 (Ill. App. Ct. 1990). *Gillis* held that the plaintiff failed to prove that its customer list was the subject of reasonable efforts designed to protect its secrecy and, therefore, the trial court erred by preliminarily enjoining the defendant from using the plaintiff's customer list. *Id.* at 886. The plaintiff in *Gillis* did not present any evidence "regarding internal or external physical security [or] that confidentiality agreements *or understandings* existed among those having access to plaintiff's lists . . . ." *Id.* (emphasis added); *id.* ("Given the testimony that copies of plaintiff's lists were available for use in the accounting and customer services department, it was incumbent upon plaintiff to show its employees *understood* that lists were to be kept confidential.") (emphasis added); *see also Jackson v. Hammer*, 653 N.E.2d 809, 815 (Ill.

9

App. Ct. 1995) (approving *Gillis*); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 921-22 (Ill. App. Ct. 2005) (same). *Liebert*, for example, concluded that the plaintiffs' customer lists were not trade secrets under the Act because there was no evidence in the record that the plaintiffs' employees were required to sign confidentiality agreements or were specifically advised that the company records were confidential. 827 N.E.2d at 923. "When such evidence is absent from the record, the plaintiff must show, at a minimum, that its employees *understood* the information was to be kept confidential." *Id.* at 923-24 (emphasis added). Even if these are not controlling holdings that an understanding is sufficient to constitute a reasonable measure, these cases do show that Illinois courts have not outright required a written confidentiality agreement in all circumstances.

Plaintiffs in this case have put forth evidence that some of Plas-Tool's customers, who have worked in the industry for years, understand that pail and lid mold information received from manufacturers is to be treated as confidential. These customers assert that it is the custom in the industry to treat such information as confidential. Defendants argue that the customer declarations submitted by Plaintiffs do not create a genuine issue of fact because "[n]o reasonable jury could find an 'industry custom' based on a couple customers out of hundreds." R. 707, Defs.' Reply at 7. That is asking too much of the summary-judgment standard. Although Defendants have submitted affidavits from other customers stating that they are *not* aware of any custom or standard in the industry requiring them to keep Plas-Tool's designs, plans, or drawings confidential, the Court "may not weigh conflicting evidence or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Group, Inc.,* 629

10

F.3d 697, 704 (7th Cir. 2011) (quotations and citations omitted). The Court concludes that the affidavits from von Holdt and other experienced members of the mold-making industry are sufficient to avoid summary judgment on this issue.[4] A genuine issue of material fact exists as to whether industry custom dictates that proprietary information disclosed by other pail and mold manufacturers be kept confidential. Accordingly, whether it was reasonable for Plaintiffs to rely on industry custom cannot be resolved on summary judgment.

Alternatively, Defendants contend that, regardless of industry custom, Plaintiffs did nothing to protect the secrecy of their purported trade secrets. For example, Defendants assert that Plas-Tool sold or distributed its molds to customers and potential customers without adequate confidentiality agreements in place. Defendants state that "[s]elling these molds without any confidentiality agreement strips the purported trade secrets the mold contained of any protection it may have had under [the Act]." Defs.' Br. at 6. Defendants further contend that Plas-Tool sent out engineering drawings, customer files and other information to many of its customers and third-parties without confidentiality agreements or stamps, and even disclosed alleged trade secrets to the public in Plas-Tool's marketing materials. DSOF ¶ 19, 23.

---

[4]As discussed in the Court's previous order, Defendants' motion to strike portions of von Holdt's affidavit is denied. R. 919 at 5-6. And Defendants failed to demonstrate that the Court must disregard the third-party affidavits proffered by Plaintiffs regarding the industry custom. The fact that Plaintiffs rely on a few customers out of hundreds to support their position that an industry-wide custom exists is something for the jury to consider when weighing the evidence.

As an initial argument, Plas-tool asserts that because it is a small company it has a lower standard of reasonableness of protective measures than a large company. This is true for very small companies. *See Elmer Miller, Inc. v. Landis*, 625 N.E.2d 338, 342 (Ill. App. Ct. 1993) ("We note reasonable steps for a two or three person shop may be different from reasonable steps for a larger company."); *Learning Curve Toys*, 342 F.3d at 717 (identifying the size and sophistication of the parties as a factor in support of finding a two-person toy company operating out of a basement took reasonable protective measures). In contrast to the companies in the cited cases, which involved companies with fewer than a handful of employees, Plas-Tool had 22 employees, 40 years of experience, and claimed to be one of "the world's leading manufacturers of pail molds" with "highly skilled, technical expertise." Pls.' Br. at 1; PSOF ¶ 73. Indeed, over the years, Plas-Tool's founder was granted dozens of patents licensed to Plas-Tool. *See* R. 718, Defs.' Resp. PSOF ¶ 31 (citing R. 538-5, Plas-Tool Rule 30(b)(6) Dep.). The Court concludes that Plas-Tool is not so small and unsophisticated as to substantially lower the standard of reasonableness for measures to protect the secrecy of its confidential information.

With respect to the reasonableness of Plas-Tool's measures, Plaintiffs contend that they limited the information provided to customers, limited employees' access to secrets, instructed employees to maintain the confidentiality, and maintained secure facilities to protect their secrets. Pls.' Br. at 5-8. Defendants again submit affidavits from some customers stating that they "have never been asked by Plas-Tool to maintain the confidentiality of any designs, plans, drawings, documents, information,

or communications . . . have not signed any written agreement of confidentiality with Plas-Tool . . . and . . . have never made any oral promise to keep anything secret." *See* R. 530, Pons Decl. ¶ 4; R. 531, Clemente Decl. ¶ 4. Defendants also point to employees' testimony that they never entered into a written agreement with Plas-Tool to protect Plas-Tool's trade secrets. DSOF ¶ 28.

"[I]n cases that address whether an employer took reasonable steps to protect information as a trade secret, the presence or absence of confidentiality agreements or other means to convey confidentiality to employees often has a significant and predictable bearing on the outcome of the case." *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 885 (N.D. Ill. 2009) (citations omitted). According to Defendants, Plas-Tool did not have confidentiality agreements with its employees to protect its confidential information. Nevertheless, several employees testified that they were instructed to keep information secret. PSOF ¶ 58.

For instance, Jacob Kampf, a machinist at Plas-Tool since 1959, when asked during his deposition if he had an oral confidentiality agreement with Plas-Tool, stated "Of course. We all did." R. 538-14 (Kampf Dep.) at 239. And when asked what the terms of the agreement were, he responded, "Terms? Not to give out any information." *Id.* Kampf further stated that the agreement applied to "any kind" of information including "how [the pail mold] was made or with what part it was made" and that it was for as long as he worked at Plas-Tool. *Id.* at 239-241. Another employee, Robert Carroll, when asked if he had entered into an oral confidentiality agreement, stated "I would say so, yes," and that he was "not to disclose anything other than what I'm

expected to do." R. 538-16 (Carroll Dep.) at 236-37. Carroll did later clarify that there was no discussion in which the specific terms of the agreement were discussed, or its beginning or end dates. *Id.* at 238-39. At his deposition von Holdt testified that he was present when his father generally warned another employee, Ruben Rodriguez, right after Rodriguez was hired that "what you learn at Plas-Tool stays at Plas-Tool," and that Rodriguez was not to use or disclose any of Plas-Tool's confidential information. R. 694, Pls.' Exh. 26, pt. 2 (von Holdt Dep.) at 219-220. When asked if it was a global warning or something more specific, von Holdt testified that "it was generalized." *Id.* at 220-21.

Defendants contend that even assuming that the above facts are true, Plas-Tool cannot protect its confidential information by issuing a generalized warning to employees not to disseminate "everything" they learned at Plas-Tool. But, as noted above, Kampf testified that his oral confidentiality agreement with Plas-Tool prohibited him from giving out "any kind" of information about how the pail mold was made and with what part it was made. Kampf Dep. at 239-41. And given the context of the employment relationship and these employees' duties (which, after all, was the context of the deposition questions), a jury could conclude that it was reasonable for Plas-Tool to give general confidentiality warnings to its employees.

With respect to other measures, the Court has reviewed the parties' briefs and citations to the record and concludes that genuine issues of material fact abound as to whether Plaintiffs limited employee access to its purported trade secrets, restricted access to pricing and sales information, stamped alleged confidential information with

14

a "confidential" stamp, or whether Plas-Tool ever disclosed confidential information to a vendor (and whether any of those facts, when taken solo or combined, comply with the Trade Secrets Act). Accordingly, viewing the evidence in a light most favorable to Plaintiffs, and given that the determination of "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the [Illinois Trade Secrets Act's] reasonableness standard ordinarily is a question of fact for the jury," *Learning Curve Toys*, 342 F.3d at 725, the Court concludes that a genuine issue of material fact exists as to whether the measures taken by Plas-Tool were sufficient to satisfy the Act's reasonableness standard.

### 2.    **Sufficiently secret**

Defendants next argue that Plaintiffs' Trade Secrets Act claim fails because Plaintiffs cannot meet the other element of the Act: the information "must be substantially secret to impart economic value to both its owner and its competitors because of its relative secrecy." *Sys. Dev. Servs.*, 907 N.E.2d at 73 (quoting *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998)). For instance, "[i]nformation that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret." *Stenstrom Petroleum Servs. Group, Inc. v. Mesch*, 874 N.E.2d 959, 972 (Ill. App. Ct. 2007) (citing *Learning Curve Toys*, 342 F.3d at 722). In addition, "[w]here information can be readily duplicated without considerable time, effort, or expense, it is not a trade secret." *Id.* (citations omitted).

Here, Defendants argue that all of Plas-Tool's purported trade secrets were publicly available and known in the mold-making industry before Arciniegas left Plas-Tool to join A-1. Defs.' Br. at 13. Specifically, Defendants point to the deposition testimony of Plaintiffs' expert, Glenn Beall, as support for their position that Plas-Tool's trade secrets could only last five or six years before another company would learn Plas-Tool's trade-secret techniques. DSOF ¶ 53. But Beall did not testify that all of Plas-Tool's secrets were known to other mold manufacturers who had been in the industry for over five or six years. R. 538-7 (Beall Dep.) at 73-81. Beall testified that, in his opinion, it takes five to six years for a mold-maker to become a specialist in the field. *Id.* at 76. Because Arciniegas left Plas-Tool in 1997, Beall was asked at his deposition whether he believed that there were mold manufacturers who knew some of Plas-Tool's claimed trade secrets before December 1997. *Id.* at 78-79. Beall responded, "I would think so, yes, some of them." *Id.* at 79. Beall explained that mold manufacturers who had been in the industry since at least 1992 would "probably" know some of "those features," but "not necessarily all of them" because "some of the non-A-1 molds . . . don't include the Plas-Tool trade secrets in them." *Id.* at 78. Beall testified that Paragon, Wentworth, Husky, and Top Grande are all very successful pail and lid mold manufacturers, but their molds do not incorporate all of Plas-Tool's trade secrets. Beall Dep. at 81. Beall opined that it is possible that these manufacturers "solved the same problem in a different way" and that "[t]here is always more than one way to build a mold." *Id.*

After examining Beall's testimony on this topic, the Court concludes that Beall's testimony does not mean that, as a matter of law, Plas-Tool's mold information was "generally known or understood within [the] industry." *Pope*, 694 N.E.2d at 617. Beall testified that, over the years, mold manufacturers learn how to improve their mold designs. Beall Dep. at 74, 80-81. Although Beall testified that some of "those features" (likely referring to a Plas-Tool mold's features) would "probably" be known by other experienced manufacturers in the industry, this is not the same as saying that the proprietary information allegedly used by A-1 was "already commonly known" or "clearly understood" in the industry at the time A-1 began manufacturing pail and lid molds. *See Sys. Dev. Servs.*, 907 N.E.2d at 79; *Service Ctrs. of Chicago, Inc. v. Minoque*, 535 N.E.2d 1132, 1136 (Ill. App. Ct. 1989). For these reasons, Beall's testimony does not serve as a basis on which to grant summary judgment.

Beall's testimony aside, Defendants claim that they can prove that each of Plas-Tool's purported technical trade secrets can be readily ascertained by examining materials that are publicly available—*i.e.*, the molds sold by Plas-Tool, mold prints and drawings given to Plas-Tool's customers, and other Plas-Tool marketing materials. Defs.' Br. at 14-15. Plaintiffs respond that even if one could reverse engineer Plas-Tool's secrets, doing so "would be expensive, time consuming, and difficult." Pls.' Br. at 16. Indeed, "[i]nformation that is derived from public sources but requires laborious accumulation, culling, and/or analysis of the public information can, however, still qualify as a trade secret." *Stenstrom Petroleum*, 874 N.E.2d at 972; *see also Hamer Holding Group, Inc. v. Elmore*, 560 N.E.2d 907, 918 (Ill. App. Ct. 1990) ("[I]nformation

17

which can be duplicated only by an expensive and time-consuming method of reverse engineering . . . could be secret, and the ability to duplicate it would not constitute a defense."). In any event, Plaintiffs deny that any of their technical trade secrets were publicly available in the first place.

The Court has considered the parties' arguments regarding whether any of Plas-Tool's claimed trade secrets were in the public domain. On the one hand, Defendants generally argue that Plas-Tool's mold information is not protected by the Trade Secrets Act because: (1) the information can be mathematically calculated using the molds, pails, lids, and prints in the open market; and (2) other manufacturers in the mold-making industry use Plas-Tool's techniques. Defs.' Br. at 14-35. In response, Plaintiffs assert that von Holdt's declaration and Beall's declaration and expert reports refute the evidence set forth by Defendants. Defendants reply that von Holdt and Beall's declarations should be disregarded because they are full of conclusory and self-serving statements, but, as already discussed, the Court largely denied Defendants' motion to strike the declarations. *See* R. 919. Beall and von Holdt have personal knowledge of Plas-Tool's trade secrets and thus their testimony can be evidence of disputed, material facts. *See Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("It is worth pointing out here that we long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.' If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts.") (citations omitted). Accordingly, the Court denies Defendants' motion for summary judgment on

18

the basis that Plaintiffs' mold information is publicly available and generally duplicated or accessible to others in the industry.

For example, Plaintiffs claim that their mold designs include a confidential and proprietary pail shrinkage sizing technique. R. 689, Pls.' Exh. 22 (Pls.' Trade Secrets List) at 1. This technique, referred to by the parties as Pail Trade Secret 1, produces a **[[[REDACTED MATERIAL PROTECTED AS TRADE SECRET**

**]]]**. *Id.* Defendants argue that this technique is not a trade secret because it is used by other mold makers throughout the industry, is readily available through shrinkage-predicting software, and can be easily discerned from Plas-Tool's molds available on the open market. Defs.' Br. at 15-19; DSOF ¶¶ 61, 63. Plaintiffs use Beall's declaration to dispute these alleged facts. First, Beall opines that although all mold makers apply a mold shrinkage factor to molds, knowing where and how much different locations will shrink is a trade secret. R. 545, Pls.' Exh. 1 (Beall Expert Report) at 16-17. **[[[REDACTED MATERIAL PROTECTED AS TRADE SECRET ]]]**. Pls.' Trade Secrets List at 1. Beall opined that studying Plas-Tool's molded pails will not reveal which mold-shrinkage factor to use in different locations. R. 649, Pls.' Exh. 3 (Beall Rebuttal Rpt.) at 5. Beall stated, however, that the amount of mold shrinkage used at different locations on a pail mold can be determined by measuring the core and cavity details and the corresponding dimensions on a pail produced by that mold. *Id.* at 6. But one would need to measure the dimensions on a pail produced by that exact

mold, and measuring the dimensions would be a difficult and time consuming process. *Id.* Also, computer software that simulates mold shrinkage factors did not provide the amount of shrinkage to use for the entire product; rather, the software only provided a mold maker with the amount of shrinkage at a particular point on a molded product. R. 678, Pls.'s Exh. 12 (Beall Decl.) ¶ 38.

Beall's testimony precludes summary judgment. Because a reasonable jury could accept Beall's testimony, Defendants have not shown as a matter of law that Pail Trade Secret 1 can be readily derived from publicly available information.

Similarly, Defendants argue that Plas-Tool's technique of fitting mold components together (Pail Trade Secret 3) is taught in at least two injection molding textbooks and used by other manufacturers in the industry. Defs.' Br. at 22-23. Defendants claim that this technique, also known as "interference fit" or "preload," can be determined using simple mathematics. DSOF ¶ 94. But Beall opined that "[s]tudying and measuring a used pail mold would not reveal the amount of preload or interference fit employed when the mold was originally assembled." Beall Rebuttal Rpt. at 5. And the textbook cited by Plaintiffs only shows preload in one of the three locations for which Plas-Tool asserts its trade secret—the text does not disclose Pail Trade Secret 3. Beall Decl. ¶ 50. Defendants' motion to strike this portion of Beall's declaration as a conclusory, unsupported opinion was denied, and the Court concludes that a reasonable jury could adopt Beall's explanation of this issue.

These examples of genuine fact issues permeate the dispute over Plaintiffs' thirteen trade secrets: Defendants propound that the information is publicly available,

and Plaintiffs' expert disagrees and sets forth his own conflicting opinion. Because Plaintiffs have put forth some evidence from which a rational jury could conclude that the Plaintiffs' techniques were in fact protectable secrets under the Trade Secrets Act, the Court cannot grant Defendants motion for summary judgment on this basis.

### 3. Misappropriation

In the alternative, Defendants argue that even if Plaintiffs' technical information qualifies as trade secrets under the Act, the Court should grant summary judgment on Count 3 because Plaintiffs do not have evidence that the secrets were misappropriated and used in Defendants' business. *See Sys. Dev. Servs.*, 907 N.E.2d at 72. Under the Trade Secrets Act, "[m]isappropriation can be shown one of three ways—by improper acquisition, unauthorized disclosure, or unauthorized use." *Liebert*, 827 N.E.2d at 925 (emphasis omitted) (citing 765 ILCS 1065/2(b)). Defendants again address each of the thirteen purported trade secrets and attempt to show that it is clear that misappropriation did not occur because (1) Arciniegas did not provide A-1 with the proprietary information, and/or (2) A-1 did not use the information to manufacture its pail and lid molds. Defs.' Br. at 40-48.

For instance, looking at Pail Trade Secret 3 again, Defendants argue that A-1 does not use interference fit (or preload) in assembling its pail molds. Defs.' Br. at 42. Plaintiffs again rely on Beall to dispute this assertion. In his supplemental expert report, Beall concludes that A-1 uses the same amount of preloads in the same locations as Plas-Tool. PSOF ¶ 100. Even if the amount of preload used by A-1 differed from Plas-Tool's by 0.00035 inches, Beall opines that this difference is immaterial.

Beall Decl. ¶ 51. The Court agrees with Plaintiffs that this evidence raises a genuine question of fact. *See* Pls.' Br. at 44. Because Beall opined that each and every one of Plas-Tool's technical trade secrets appear in molds manufactured and sold by A-1, summary judgment cannot be granted on this ground. *Id.* at 43-44.

Moreover, there is sufficient evidence in the record that Arciniegas may have been responsible for the misappropriation. For instance, Beall opines that Plas-Tool's Pail Trade Secret 1 was not implemented at A-1 until after Arciniegas joined A-1. Beall Decl. ¶ 45. According to Beall, before Arciniegas arrived, none of A-1's 68 mold designs used three different shrink rates. *Id.* Beall's review of A-1's mold designs and drawings indicates to him that, within months of Arciniegas joining the company, A-1 was actively manufacturing sophisticated pail molds incorporating Plas-Tool's trade secrets and selling those molds to Plas-Tool's customers in Central and South America. *Id.* ¶ 36. Additionally, Plaintiffs assert that shortly before Arciniegas resigned from Plas-Tool, he accessed several engineering files within minutes of each other. Von Holdt Decl. ¶ 76. Plaintiffs' review of Arciniegas's electronic files revealed that Arciniegas viewed files for a wide variety of molds, and that Arciniegas's rapid viewing pattern is not reflected in any other files and folders on Plas-Tool's computers. *Id.* ¶ 79. Thus, Plaintiffs believe that Arciniegas was not viewing the files for their normal use as a starting point for new designs or to aid in repairing damaged molds. *Id.*

For all of these reasons, the Court denies Defendants' motion for summary judgment as to Plaintiffs' technical trade secrets.

## B. Non-technical information

### 1. Sufficiently secret

Plaintiffs also contend that Defendants misappropriated Plaintiffs' confidential information about Plas-Tool's customers in violation of the Trade Secrets Act. Pls.' Br. at 42. Defendants first argue that information contained in Plaintiffs' customer list is not a trade secret because this information is commonly known and easily duplicated from public sources. Defs.' Br. at 36-38. For instance, Defendants assert that mold makers can easily locate the name and contact information of mold customers through resources such as the Yellow Pages, the Internet, trade organizations and expos, plastic materials suppliers, and other vendors. *Id.* at 37; *see also* R. 696-1 (Stull Expert Report) at 62-67. Plaintiffs counter that it took them considerable time, effort, and expense to accumulate information about their customers, and identifying buyers interested in purchasing molds on behalf of manufacturers is actually very difficult to determine from publicly-available sources. PSOF ¶ 11; von Holdt Decl. ¶ 74. Plaintiffs claim that the same is true for information concerning the products the customers needed, the products the customers ordered in the past, and how much customers paid for products. PSOF ¶ 11. Plaintiffs contend that all of this customer-related information gave them a significant commercial advantage. Pls.' Br. at 5.

"Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means." *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002) (citation omitted). At the same time, in a competitive market,

23

an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation. *Id.* (citation omitted). Thus, "[t]he plaintiff must prove that the real value of the information lies in the fact that it is not generally known to others who could benefit from using it." *Sys. Dev. Servs.*, 907 N.E.2d at 73 (internal quotation omitted). Illinois courts instruct that customer lists are *not* trade secrets where the "information is readily available to competitors through normal competitive means." *Id.* at 75-76 (quoting *Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1085 (Ill. App. Ct. 1992)). For instance, *Office Mates 5* denied the plaintiff's motion for a preliminary injunction because the plaintiff did not have a protectable interest in its client information, which included the following: the client's name, address, and key contact person; the fee the client was willing to pay; and the client's order history. 599 N.E.2d at 1084-85. *Office Mates 5* concluded that this information was readily available to anyone in the business capable of canvassing or finding a directory, whether it be the Yellow Pages or a specialized directory, placing a cold call to that business, and asking specific questions designed to elicit the information. *Id.* at 1084; *see also Sys. Dev. Servs.*, 907 N.E.2d at 74-76 (collecting cases).

Here, Plaintiffs argue that their customer information is not easily discoverable by others in the mold industry. Plaintiffs rely primarily on Beall's rebuttal report in which he opines "that whereas it is relatively easy to find an address and phone number for a company, it is difficult or impossible to find the name of a buyer in one

24

of that company's several facilities that just happens to have a need for a pail mold."

Beall Rebuttal Rpt. at 4-5. According to Beall,

> These difficulties become magnified when a potential customer is located outside of the United States. Knowing how to contact that particular buyer is an important commercial advantage. Knowing a potential customer's credit rating, reordering practice, and what they are accustomed to paying for pail and lid molds gives a supplier a commercial advantage over the uninformed competition. This type of customer information is not readily available from standard listings.

*Id.* at 5. Also, Plaintiffs' damages expert, William Kerr, opined that although "A-1 might have acquired this information without the material brought by Arciniegas . . . it would have taken significant amounts of time, expense and effort." R. 653, Pls.' Exh. 7 (Kerr Rpt.) at ¶ 82.

The parties' experts have conflicting opinions about how difficult it is to obtain customer information and thus it is an issue for a jury to evaluate and decide. Plaintiffs have put forth sufficient evidence from which a reasonable jury could conclude that Plaintiffs' customer information meets the definition of "trade secret" under the Act. Therefore, the Court denies Defendants' motion for summary judgment on this basis.

## 2. Misappropriation

Defendants argue that Plaintiffs' Trade Secrets Act claim must fail because Defendants did not misappropriate the alleged non-technical trade secrets. Defs.' Br. at 48-49. According to Defendants, Plaintiffs have no evidence to support their contention that Defendants received the customer lists. DSOF ¶ 199. As Plaintiffs note, however, Defendants acknowledge that Arciniegas, A-1's employee, had some of

Plaintiffs' customer names in his possession. Defs.' Br. at 48; Pls.' Br. at 43. Moreover, contradictory testimony exists as to whether Arciniegas acquired a lengthy list of Plas-Tool's customers and whether Arciniegas took the list with him when he left Plas-Tool. *See* PSOF ¶¶ 21-23; Defs.' Reply at 13. Thus, whether Arciniegas misappropriated the list presents a genuine issue of material fact.

Defendants further assert that Plaintiffs offer no evidence that Defendants used any customer information, pricing information or "ordering history." Defs.' Br. at 48. Plaintiff cites, however, to several instances of sales of pail molds by A-1 to former Plas-Tool customers. PSOF ¶¶ 25-27, 105. Accordingly, a genuine issue of material fact exists as to this issue as well.

To summarize, the Court concludes that a reasonable jury could find that Plaintiffs have demonstrated their technical and non-technical information was (1) the subject of reasonable efforts to maintain secrecy, (2) remained sufficiently secret to provide economic value, and (3) was misappropriated by Defendants. The Court therefore denies Defendants' motion for summary judgment on Count 3.

## IV. Preemption of Other Torts

Defendants contend that they are entitled to summary judgment on Plaintiffs' tort claims (Counts 4, 7-9) because these claims are preempted by § 1065/8 of the Trade Secrets Act. Section 1065/8 states:

(a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

(b) This Act does not affect:

* * *

(2) other civil remedies that are not based upon misappropriation of a trade secret;

* * *

765 ILCS 1065/8.

The effect of the statute was incorporated in the previously-assigned judge's order, which stated that "to the extent . . . [the tort claims] are based on a misappropriation of trade secrets, they are preempted by the [Act]." R. 221 at 10. Defendants argue that the tort claims are based on misappropriation of trade secrets because the breaches involved using the purported trade secret of customer contact information. This argument, however, is contrary to Seventh Circuit and Illinois law. *Hecny Transp. Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005). The Seventh Circuit has held that claims for breach of fiduciary duty, even if they are based on conduct involving purported trade secrets, are *not* preempted by the Trade Secrets Act. *Hecny Transp.*, 430 F.3d at 404-05 ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record."); *see also Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1150 (Ill. App. Ct. 2009) (finding Trade Secrets Act does not preempt breach of fiduciary duty claims). Therefore, Count 4 alleging breach of fiduciary duty and Count 7 alleging inducement of breach of fiduciary duty are not preempted by the Act.

Similarly, Count 8 for tortious interference and Count 9 for conspiracy to tortiously interfere are not preempted by the Trade Secrets Act under the reasoning of *Hecny*. These claims are based on Defendants' alleged diversion of Plas-Tool's customers to A-1. *See* Pls.' Br. at 47-48. It does not matter, for these claims, whether Defendants used purported trade secrets or public information to deprive Plaintiffs of a business opportunity. *See Dominion Nutrition, Inc. v. Cesca*, 2006 WL 560580, at *4 (N.D. Ill. Mar. 2, 2006). Therefore, Plaintiffs' tort claims are not preempted by the Trade Secrets Act.

## V. Fiduciary Duty (Count 4)

In Count 4, Plaintiffs allege that Arciniegas breached his fiduciary duty to Plas-tool by "diverting Plas-tool's potential business opportunities to A-1 while he was still employed by and a member and director of Plas-Tool." Pls.' Br. at 56. Illinois law requires proof of three elements to succeed on a breach of fiduciary duty claim: a fiduciary duty exists, that the fiduciary duty was breached, and damages proximately caused by the breach. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010) (citation omitted). In addition, although the parties do not address this, there are different standards for employees and officers when it comes to breach of fiduciary duty. *See Veco Corp. v. Babcock*, 611 N.E.2d 1054 , 1059 (Ill. App. Ct. 1993) (corporate officers "stand on a different footing" than employees). Officers "owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal benefit, or (2) hinder the ability of the

corporation to continue the business for which is was developed." *Id.* (citations omitted).

Defendants argue that the record fails to establish any breach of duty by Arciniegas or any damages to Plas-Tool. Defs.' Br. at 58. Specifically, Defendants note that while Arciniegas may have directed up to four potential customers—Maghfran, Lhaura Vet, Plastigel, and Romi—to A-1 while he was still employed by Plas-Tool, the evidence shows that von Holdt instructed Arciniegas to refer work to A-1 because Plas-Tool could not do it, either because of lack of capacity or lack of ability. *See id.*; DOSF ¶ 279. Accordingly, Defendants contend that because Arciniegas cannot be held liable for breaching his fiduciary duty by following the directions of his principal, the breach of fiduciary duty claim must fail. Alternatively, Defendants assert that von Holdt directed Arciniegas to enter into a joint-referral relationship with A-1, not to divert business away from A-1.

At his deposition, however, von Holdt appears to have testified, however, regarding two different types of relationships with A-1. First, as noted by Plaintiffs, von Holdt stated that he directed Arciniegas to explore a joint-referral relationship with A-1 in which there would be "referrals back and forth depending on [the company's] expertise" with no commission taken. R. 538-24, Defs.' Exh. 20 (von Holdt Dep.) at 19. Von Holdt also testified, as pointed out by Defendants, that when Arciniegas told von Holdt that Arciniegas had a customer who was interested in a square mold at a time when Plas-Tool was working "almost at full capacity," *id.* at 20,

von Holdt instructed Arciniegas to approach A-1 and see if A-1 could do the mold construction if Plas-Tool did the design work. *Id.* at 21.

Because a genuine issue of material fact exists as to exactly what Arciniegas was instructed to do, when he was instructed to do it, and as to which customers he was instructed to do it, the motion for summary judgment on this ground must be denied.

Defendants also contend that Plas-Tool cannot show damages and, therefore, the breach of fiduciary duty claim must fail. According to Defendants, "Plas-Tool is simply seeking compensation for jobs it did not have the opportunity, ability or inclination to perform." Defs.' Br. at 58. Plaintiffs' damages could include, however, some or all of Arciniegas's salary if a breach is demonstrated; thus, damages could exist without reference to Plas-Tool's ability or capacity to perform. *See Veco Corp.*, 611 N.E.2d at 1062 ("An employer may recover an employee's total compensation paid during the time period that an employee was breaching fiduciary duties owed the employer."). Moreover, on this record, it is for the jury to decide the damages that were caused by alleged breach of duty. Accordingly, the motion for summary judgment based on Plaintiffs' failure to show breach or damages is denied.

## VI.  Inducement of Breach (Count 7)

Plaintiffs also allege a claim for inducement of breach of fiduciary duty against Geoffrey Luther, LeRoy Luther, A-1, and Triangle (Count 7). "[A] third party who colludes with a fiduciary in committing a breach of duty, induces or participates in such breach, and obtains the benefits therefrom is directly liable to the aggrieved party." *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 829 N.E.2d 818, 827 (Ill. App.

Ct. 2005) (citation omitted). Defendants argue that summary judgment is appropriate on this claim for several reasons. First, they argue that because Plas-Tool cannot establish the underlying breach of fiduciary duty, it cannot establish inducement to breach. Defs.' Br. at 59. But the Court concluded that a genuine issue of material fact precluded judgment on the breach of fiduciary duty claim. Therefore, that argument fails.

Defendants next contend that judgment is proper on the inducement claim "because Plas-Tool has neither proof of collusion, nor evidence that the defendants knowingly obtained the benefit of the alleged breach." *Id.* at 59. In support, they simply and generally cite to statements of material facts ¶¶ 267-300. That generalized citation without explanation in the brief is insufficient to articulate an argument in support of summary judgment. This ground is also rejected.

Defendants' final argument, however, does compel the entry of summary judgment on Count 7. Specifically, Defendants assert that they did not benefit from the alleged referrals because they did not receive work from Lhaura Vet or Plastigel. Defs.' Br. at 59. And although Maghfran initially awarded Defendants a contract, Maghfran failed to pay, leaving A-1 with a substantial loss. *Id.* Plaintiffs do not address this argument in their response. *See* Pls.' Br. at 57. Because Plaintiffs do not point to any evidence creating a genuine issue of material fact as to this element of their claim for inducement, the Court concludes that Defendants' motion for summary judgment on Count 7 must be granted.

## VII.  Tortious Interference

### A.  Tortious Interference with Business Expectancy (Count 8)

Plaintiffs claim that Arciniegas tortiously interfered with Plas-Tool's prospective business expectancy from five potential customers: Maghfran, Lhaura Vet, Plastigel, Saiar, and Romi. *See* Defs.' Br. at 51. In Illinois, a claim of tortious interference with a prospective business relationship requires the following four elements be proven: (1) the existence of the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from being fulfilled; and (4) damages to the plaintiff resulting from the defendant's interference. *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). Here, Defendants challenge only the first and fourth elements.

### 1.  Maghfran

Defendants first argue that Plaintiffs have no evidence in support of a finding a reasonable business expectancy with Maghfran. Plaintiffs respond that "[t]aken together, Plas-Tool's success in South America and intentions to do business there, the correspondence with Maghfran representatives, Maghfran's visit to Plas-Tool from Brazil and subsequent requests for quotes, clearly support the conclusion that Plas-Tool had a reasonable expectation of entering a business relationship with Maghfran." Pls.' Br. at 51. But, under Illinois law, a plaintiff must show more than a mere hope or opportunity of future business dealings. *See Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1300 (Ill. 1996). The facts set forth by Plaintiffs do not show that Plas-Tool's

expectation of a business relationship with Maghfran was "more than a mere hope." Indeed, Plaintiffs do not rebut Maghfran's deposition testimony that he did not need the round pail molds that Plas-Tool produced and that he "did not want Plas-Tool to build this mold." DSOF ¶ 275. Plaintiffs point to von Holdt's deposition testimony, but von Holdt simply testified that Maghfran visited Plas-Tool and that there had been some communications between Maghfran and Plas-Tool. R. 693, Pls.' Exh. 26, pt. 1 (von Holdt Dep.) v at 90-94. In addition, Plas-Tool fails to point to any evidence establishing a genuine issue of material fact that it suffered damages as a result of the alleged interference. Accordingly, the motion for summary judgment on this claim as it relates to Maghfran is granted.

### 2.    Lhaura Vet

Defendants also contend that no genuine issue of material fact exists as to the existence of a reasonable business expectancy between Plas-Tool and Lhaura Vet. As Defendants note, Lhaura Vet was not and never has been a Plas-Tool customer. Von Holdt testified that he had not heard of Lhaura Vet until this lawsuit was filed. DSOF ¶ 191. Plas-Tool fails to point to any evidence that supports the finding of a reasonable business expectancy with Lhaura Vet. As with Maghfran, Plas-Tool points to its "expertise, previous business in South America and requests for quotations" as evidence that Plas-Tool had a reasonable expectation in entering into a business relationship with Lhaura Vet. Pls.' Br. at 52. But Plas-Tool does not cite to any authority supporting the argument that general assertions of expertise and previous presence in a market support a finding of a reasonable business expectancy.

33

In addition, Plas-Tool's reference to Lhaura Vet's request for quotations does not establish a reasonable business expectancy. *See MPC Containment Sys. v. Moreland*, 2008 WL 2875007, at *15 (N.D. Ill. July 23, 2008) ("[M]erely submitting bids for future contracts or demonstrating a past contractual relationship may be insufficient to demonstrate a reasonable business expectancy.") (citations omitted); *Quadro Enters., Inc. v. Avery Dennison Corp.*, 2000 WL 1029176, at *10 (N.D. Ill. Jul. 26, 2000) ("Quadro merely received an invitation to bid on the label business. The fact that Quadro was asked to bid implies that the contract was up for competitive bidding and thus it cannot be said that Quadro had an expectancy of future business relations."); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Gould, Inc.*, 1995 WL 340967, at *5 (N.D. Ill. June 2, 1995) ("The general rule is that price quotations are not offers, but rather are mere invitations to enter into negotiations or to submit offers."). Accordingly, the Court grants Defendants' motion for summary judgment on the tortious interference claim with respect to Lhaura Vet.

### 3.    Plastigel

As to Plastigel, Plaintiffs state that "Plastigel, through a broker, contacted Plas-Tool regarding the possibility of purchasing a mold." Pls.' Br. at 52. For the reasons stated above, simple contact regarding the possibility of purchasing a mold does not demonstrate that Plas-Tool's expectation was "more than a mere hope." *MPC Containment Sys.*, 2008 WL 2875007, at *15. Accordingly, judgment as to Plastigel on this count is granted.

### 4. Sair

Plaintiffs contend that when Sair requested a price quote, Arciniegas instead offered to license Saiar technology that he owned. PSOF ¶ 130-31. When Saiar evaluated the license offer, it determined it was too high and declined. *Id.* ¶ 132. Thus, Plas-Tool argues that it never got the opportunity to give Saiar a quote. Again, however, even assuming that Arciniegas had given Saiar a price quote from Plas-Tool, as already noted, providing price quotes is insufficient to establish a reasonable expectation of business expectancy. Thus, judgment as to the tortious interference claim with respect to Saiar is also granted.

### 5. Romi

Finally, Plaintiffs state that Arciniegas, on behalf of Plas-Tool, was supposed to meet with representatives of a company named Romi in Brazil, who were going to introduce Arciniegas to several of Romi's customers. PSOF ¶ 135. According to von Holdt, Arciniegas canceled the meeting with Romi so that he could later attend on behalf of Defendants. PSOF ¶ 136. Based on the case law already discussed above, simply meeting with a broker who was going to provide introductions fails to establish a reasonable business expectancy. Plaintiffs assert that Romi had two "strong projects" in Brazil that were not consummated due to Arciniegas's interference. Pls.' Br. at 53. Although Romi did indicate to Plas-Tool that it was of the "utmost importance" that it send a representative to Brazil to close these two deals, *see* PSOF ¶ 137, it is undisputed that von Holdt sent a letter to Romi indicating that Plas-Tool could not send anyone to Brazil. Thus, any failure to obtain the business is due to Plas-Tool's

own decision not to send a representative to Brazil. The Court grants summary judgment to Defendants with respect to the tortious interference claim as to Romi.

**B.    Conspiracy to Tortiously Interfere with Business Expectancy (Count 9)**

As to the conspiracy to tortiously interfere (Count 9), Defendants argue that because the tortious interference claim fails, so does the claim for conspiracy to tortiously interfere. The Court agrees. Because the Court granted summary judgment on the tortious interference claim, summary judgment on the conspiracy claim is also warranted. *Sanchez & Daniels v. Koresko & Assocs.*, 2006 WL 3253604, at *6 (N.D. Ill. Nov. 8, 2006) ("Because the Court has determined that Koresko cannot sustain claims for tortious interference or abuse of process, any claims for conspiracy to commit those torts or aiding and abetting others in committing them necessarily fail.").

## VIII.  Conclusion

For the above reasons, Defendants' motion for summary judgment on the state-law claims [R. 524] is granted in part and denied in part. Defendants' motion is granted on Counts 7, 8, and 9; the motion is denied as to Counts 3 (Trade Secrets Act) and 4 (fiduciary duty). At the January 29, 2013 status hearing, the parties should be prepared to discuss whether they wish to hold a settlement conference (the parties are encouraged to start discussing settlement amongst themselves), or instead set a trial date.

ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: January 3, 2013